598 A.2d 771

Anthony CICORIA

v.

STATE of Maryland.

No. 1974, Sept. Term, 1990.

Court of Special Appeals of Maryland.

Nov. 29, 1991.

Certiorari Granted Feb. 27, 1992.

William C. Brennan, Jr. (Knight, Manzi, Brennan, Ostrom & Ham, on the brief), Upper Marlboro, for appellant.

Mary Ellen Barbera, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen., on the brief), Baltimore, for appellee.

Argued before MOYLAN, ALPERT and MOTZ, JJ.

ALPERT, Judge.

We are called upon to decide, *inter alia,* whether an office holder and candidate for political office can be convicted of stealing from "his" campaign committee's funds.

Appellant, Anthony Cicoria, appeals convictions on the following counts:[1] count I was for theft of more than $300.00 from Citizens for Cicoria,[2] count II was for conspiring with his wife, Catherine Cicoria, to commit felony theft, and three counts were for tax evasion.

---

1. The State had previously indicted Mr. Cicoria on similar counts. The lower court dismissed some counts and the State nol prossed the others.

2. Citizens for Cicoria was a campaign committee organized to help further Mr. Cicoria's run for office.

All the charges stemmed from Cicoria's election campaign and tenure in office as Councilman for the Second District, Prince George's County, Maryland. In short, the State alleged that Mr. and Mrs. Cicoria improperly used campaign funds for personal benefits and deposited those funds in a joint account. Those funds totalled $64,324.50. The State asserted that the Cicorias employed several schemes to steal money from Citizens for Cicoria. For example:

1) In one plot, according to the State Prosecutor, Citizens for Cicoria reimbursed Mr. Cicoria for a $2300 loan—a loan that the committee never received. In actuality, $2300 worth of contributions were not reported as discrete contributions with specific donors. Instead, the ledger listed Mr. Cicoria as giving the committee a check (loan) for $2300.

2) Mr. and Mrs. Cicoria, along with Mr. Cicoria's mother, purchased a unit (titled in their names) at the Prince George's Plaza Professional Park in December of 1986. Citizens for Cicoria paid $30,112.49 towards the unit's purchase price because Mr. Cicoria used the office as his headquarters. Yet, surprisingly, the Cicorias deducted the interest payments from their personal income taxes.

3) Using a false expense scheme, checks for payment to CN printing were actually made out to Catherine Cicoria.

4) Campaign contributions were deposited directly into the Cicorias' joint bank account. The statutory procedure requires the treasurer of the committee to deposit funds in the committee bank account and then disburse checks for expenditures.

In addition to those theft schemes, the State contended that the Cicorias violated State tax laws because they did not report those "extra funds" on their tax returns for 1986–88.

## THE PROCEEDINGS BELOW

On November 21, 1989, a Grand Jury of the Circuit Court for Prince George's County, Maryland charged appellant with four counts of theft, one count of conspiracy to commit

theft, two counts of perjury, one count of failure to complete a campaign report, and three counts of tax evasion.[3] Judge Bowling of the Circuit Court for Charles County was assigned to the case because Mr. Cicoria was a sitting member of the Prince George's County Council.

Cicoria filed a Motion to Dismiss the charges against him. The circuit court, on February 16, 1990, dismissed the four theft counts and the one conspiracy count on the ground that the State Prosecutor exceeded his statutory authority in presenting the case to the Grand Jury.[4] In addition, the

---

3. The Grand Jury returned similar charges against Catherine Cicoria.

4. The record does not contain a transcript of the motions hearing before Judge Bowling. We get our information from a letter to Mr. Alexander Williams, Jr., State's Attorney for Prince George's County, from Mr. Stephen Montanarelli, State Prosecutor, dated March 2, 1990. In addition, at a motions hearing on September 5, 1990, Judge Nalley discussed Judge Bowling's ruling.

THE COURT [JUDGE NALLEY]: The reason I raise it, and Mr. Touhey [Mrs. Catherine Cicoria's Counsel] might want to talk about it, but you said something slipped your mind. Page nine of Mr. Weiner's [Former Counsel for Mr. Cicoria] memo, which you are adopting, the first full paragraph, the second line of that page he says, "The most critical of the ultimate facts in the first indictment was whether the theft-related offenses were multi-jurisdictional offenses or not. That issue was resolved against the State, and that decision become final."

I attached an awful lot of significance to that assertion. It seems to me that you have one question: If indictment number one was or the charges in indictment number one were dismissed because the prosecutor didn't have authority to do something and his authority might have been lacking or Judge Bowling might have concluded that the prosecutor lacked authority, regardless of whether Alex Williams was involved or not, if he concluded as a matter of fact based on whatever was before him that the theft-related offenses were not multi-jurisdictional. Okay.

On the other hand, his conclusion might have been based on whatever was presented to him. Whether or not the offenses were mu[l]ti-jurisdictional he didn't have to reach that issue if he had been persuaded that the State Prosecutor for some other reason, such as not being solicited by a State's Attorney, had no business being involved in this kind of matter, and I just wondered if either of you wanted to talk about that.

Mr. Touhey.

MR. TOUHEY: Your Honor, your analysis just now to my belief strikes all the reason why the case should be dismissed because you are left in the very simple quandary of trying to be an appellate review, a second review of the decision of Judge Bowling. I mean

court dismissed the perjury counts and the failure to file a complete campaign report charge.[5]  The State nol prossed the remaining charges, thereby ending the first prosecution.

Subsequently, on March 19, 1990, the Grand Jury of the Circuit Court for Prince George's County returned a second indictment against Mr. and Mrs. Cicoria.  The indictment included one count of felony theft, one count of conspiracy to commit felony theft, two counts of making false statements,[6] and three counts of tax evasion.  Cicoria made a Motion to Dismiss the remaining counts of the indictment, Motion for Appropriate Relief,[7] and a Motion to Recuse

---

his order is quite clear.  I mean his order says that he was dismissing one through six of the first indictment, and so we are clear as to what we are talking about, one through six, as I recall, were the theft charges.

MR. NEVIN: One through five.

THE COURT: What were dismissed were the theft charges.

MR. TOUHEY: And conspiracy, common law conspiracy.

THE COURT: Theft and the conspiracy charges were related to the theft.

MR. TOUHEY: That's right.  He says the State Prosecutor exceeded his statutory authority in presenting inclusive one through six to the Grand Jury.  Now, I don't know what he meant by that.  I don't know what the evidence before him suggested in that regard, but the issue is not for you to try and go back and figure out what was before him as to the first indictment.

THE COURT: Well, as you folks who are asking me to dismiss this set of charges based on what you say may have been before Judge Bowling, you are the moving party, isn't there a burden on you to tell me or demonstrate to me what it was that Judge Bowling was ruling?

MR. TOUHEY: No, all our burden is, Your Honor, to say Judge Bowling had before him certain facts, issues and arguments, and he made a ruling that was in the nature of a final judgment that there was a defect and that the case would be dismissed as to those counts.

5. Mr. Cicoria alleges that the lower court dismissed the perjury counts because "the elements of the crime were not set out in sufficient detail in the indictment" and dismissed the campaign violation charge because "the charge was impermissibly vague."  He provides us with no record citation for us to determine the veracity of these statements.

6. The State dismissed these counts at a later date.

7. Mr. Cicoria wanted more time to provide handwriting exemplars.

Judge Nalley of the Circuit Court for Charles County. At a hearing on September 5, 1990, the court denied all of Cicoria's motions.

The court granted Cicoria a one week continuance because Mrs. Cicoria, his co-defendant, fled the jurisdiction and did not appear for trial on the scheduled date. The trial was mostly a "paper affair." Witnesses testified about bank accounts, committee ledgers, handwriting analysis, and so on. At the conclusion of the State's case, and again at the conclusion of all the evidence, Cicoria moved for Judgment of Acquittal, which motions the trial court denied. Specifically, Cicoria requested that the court strike all exhibits and testimony concerning the alleged joint bank account held by Cicoria and his wife.

After the twelve day trial, the jury convicted Cicoria of all charges. On December 12, 1990, Judge Nalley sentenced Cicoria to concurrent sentences of ten years with all but five years suspended and five years of probation. The court also denied Cicoria's request for bond pending appeal. Cicoria appeals to this court, raising the following issues:

I.  Does the theft statute apply to election law violations? Specifically, do Count One theft and Count Two conspiracy to commit theft properly charge offenses which would apply to candidate Cicoria?

II.  Did the State prosecutor have the statutory authority to bring the charges in this case?

III.  Did the court err by not dismissing Counts One and Two because those counts had been previously dismissed on the merits in a prior proceeding?

IV.  Did the court erroneously admit evidence concerning a purported joint bank account when the State did not sufficiently prove that it was a joint bank account?

V.  Did the State prove a willful violation of the State Income Tax Laws despite Cicoria's good faith defense?

VI.  Did the court err by not recusing itself at the trial of this case?

## I.

Does the theft statute apply to election law violations? Specifically, do Count One theft and Count Two conspiracy to commit theft properly charge offenses which would apply to candidate Cicoria?

The Grand Jury indicted Cicoria for theft from Citizens for Cicoria—his election campaign committee. He argues that: (1) the State cannot convict him for stealing contributions that were for his personal use—he cannot steal from himself; (2) the Election Code does not establish a legal "owner" of funds as found in article 27, § 340(g); (3) the Election Code regulatory scheme precludes the State from prosecuting him under other statutes or common law for election related offenses; and (4) assuming the Election Code does create an owner of the campaign contributions, that owner is the *treasurer* [8] of Citizens for Cicoria, *not* the entity Citizens for Cicoria.

Cicoria appears to rely on *Williams v. State*, 302 Md. 787, 490 A.2d 1277 (1985), for the proposition that "[i]t is fundamental that a court is without power to render a verdict or impose a sentence under a charging document which does not charge an offense within its jurisdiction prescribed by common law or by statute." *Id.* at 791, 490 A.2d 1277.

To understand better Cicoria's contentions, we examine article 27, § 342(a), (b) (Maryland's theft statute).

(a) *Obtaining or exerting unauthorized control.*—A person commits the offense of theft when he willfully or knowingly obtains control which is unauthorized or exerts control which is unauthorized over property of the owner, and:

(1) Has the purpose of depriving the owner of the property; or

---

8. Catherine Cicoria, the candidate's wife, served as the chairperson for Citizens for Cicoria (as did others) and also exercised a *great* deal of control over the campaign finances.

(2) Willfully or knowingly uses, conceals, or abandons the property in such manner as to deprive the owner of the property; or

(3) Uses, conceals, or abandons the property knowing the use, concealment, or abandonment probably will deprive the owner of the property.

(b) *Obtaining control by deception.*—A person commits the offense of theft when he willfully or knowingly uses deception to obtain and does obtain control over property of the owner; and

(1) Has the purpose of depriving the owner of the property; or

(2) Willfully or knowingly uses, conceals, or abandons the property in such manner as to deprive the owner of the property; or

(3) Uses, conceals, or abandons the property knowing such use, concealment, or abandonment probably will deprive the owner of the property.

Cicoria does not maintain that he did not take monies from his campaign committee, rather, he argues that Citizens for Cicoria did not own the money in its account (or contributions intended to go into its account). Therefore, to simplify the discussion, we consider who "owned" the funds at issue.[9]

---

**9.** Two committees of the Maryland Legislature considered amendments that, if enacted, would have simplified our present task. Under House Bill # 1387, campaign funds or property would not be considered the personal property of the candidate or the committee. H.D. 1387, 1989 Sess. (withdrawn from the Committee on Constitutional and Administrative Law). House Bill # 1480 specifically would have precluded a candidate from disbursing surplus campaign funds in a manner that "personally benefits" the candidate. H.D. 1480, 1990 Sess. (unfavorable report from the Committee on Constitutional and Administrative Law).

Trying to determine what the legislature intended (or did not intend) by rejecting those bills is no easy assignment. In *Automobile Trade Ass'n v. Insurance Comm'r,* 292 Md. 15, 437 A.2d 199 (1981), the Court of Appeals stated that "the fact that a bill on a specific subject fails of passage in the General Assembly is a rather weak reed upon which to lean in ascertaining legislative intent." *Id.* at 24, 437 A.2d

A.

Section 340(g) defines the word owner.

*"Owner"* means a person, other than the offender, who has possession of or any other interest in the property involved, even though that interest or possession is unlawful, and without whose consent the offender has no authority to exert control over property.

We also look to various sections of the Fair Election Practices Act for help in clarifying the issue. Md.Ann.Code art. 33, §§ 1-1-32-6 (1986 repl. vol. & supp. 1989).

First, each candidate [10] for a state public office must have either a treasurer [11] or an authorized candidate campaign

───

199. In the present case, the bills never made it to the House floor. On that point, the Supreme Court of Illinois noted that "the failure of a committee [of the legislature] to act favorably on a proposed bill should not be relied upon, in the absence of an indication as to the reason for the failure, to ascertain legislative intent." *Maiter v. Chicago Bd. of Educ.,* 82 Ill.2d 373, 47 Ill.Dec. 721, 415 N.E.2d 1034, 1039 (Ill.1980), *cert. denied,* 451 U.S. 921, 101 S.Ct. 2000, 68 L.Ed.2d 312 (1981). Moreover,

> caution must be exercised in using the action of the legislature on proposed amendments as an interpretive aid. Action on a proposed amendment is not a significant aid to interpretation of an act that was passed years before. Committee reports on amendatory or supplemental legislation are not relevant for the purpose of interpreting the original legislation.

2A Sutherland, Statutes and Statutory Construction (by N.J. Singer) § 48.18 at 341 (Sands 4th ed. 1984 rev.) (footnotes omitted). Thus, we draw neither a positive nor negative inference from the Committee's materials.

10. " 'Candidate' means any person who files a certificate of candidacy for any public or party office." Md.Ann.Code art. 33, § 1-1(a)(4) (Supp.1989).

11. "Treasurer" means any person appointed by a candidate, political agent, political committee, or political party or partisan organization to receive or disburse money or other things of value to promote or assist in the promotion of the success or defeat of any candidate, political party, principle or proposition submitted to a vote at any election.
*Id.* § 1-1(a)(18).

committee.[12] *Id.* § 26–3. Section 26–3 states that

each candidate for nomination for, or election to, public or party office, upon or before, and as a condition precedent to qualifying as [a] candidate, shall appoint one campaign treasurer and shall file the name and address of the treasurer with the board or with the State Administrative Board of Election Laws as provided in subsection (c) of this section

.    .    .    .    .

A candidate for whom an authorized candidate campaign committee has been established is exempt from the campaign treasurer requirement of subparagraph (i) of this subsection.

In the present case, Cicoria's campaign committee was Citizens for Cicoria.

Second, the campaign committee should have a chairperson, and a treasurer who is not the candidate. *Id.* §§ 26–3(c), –4(a).

[B]ut a candidate for a public or party office or nomination to public or party office may not designate himself as his own treasurer, or subtreasurer.

*Id.* § 26–3(c).

Every central committee, partisan organization, or political committee, ... except political clubs, shall appoint and constantly maintain a chairman and a treasurer.

*Id.* § 26–4(a).

Third, campaign funds must first go through the treasurer's hands.

---

**12.** " 'Authorized candidate campaign committee' means a political committee established under § 26–4 of this article and authorized by a candidate to promote his candidacy." *Id.* § 1–1(a)(1). The code also defines "political committee."

"Political committee" means any combination of two or more persons appointed by a candidate or any other person or formed in any other manner which assists or attempts to assist in any manner the promotion of the success or defeat of any candidate, candidates, political party, principle or proposition submitted to a vote at any election.

*Id.* § 1–1(a)(14).

> "Contributions" means the gift, transfer or promise of gift or transfer of money or other thing of value to any candidate, or his representative, or a representative of any political party or partisan organization to promote or assist in the promotion of the success or defeat of any candidate, political party, principle or proposition submitted to a vote at any election.

*Id.* § 1–1(a)(5).

> "Expenditure" means any gift, transfer, disbursement or promise of money or valuable thing by any candidate, treasurer, or other agent of such candidate, political party or partisan organization to promote or assist in the promotion of the success or defeat of any candidate, political party, principle or proposition submitted to a vote at any election.

*Id.* § 1–1(a)(7).

> *Contributions and expenditures to pass through treasurer.*—All contributions, money or other valuable things collected, received or disbursed by any candidate or committee for any purpose, shall be paid over to and made to pass through the hands of the treasurer and, except as provided in § 26–5(c)[13] of this article, shall be disbursed by him. It is unlawful for any candidate or any member or members of a committee, or for any member or members of a political committee, to make any expenditure, to disburse or expend money or any other valuable things, for any purposes until the money or other valuable things so disbursed or expended has passed through the hands of the treasurer.

*Id.* § 26–6(a).

Fourth, even contributions made by the candidate or his spouse "must pass through the hands of the candidate's treasurer...." *Id.* § 26–8(a).

> *Contributions and expenses.*—The contributions of a candidate or his spouse to the candidate's own campaign

---

**13.** This section deals with a petty cash fund.

are not subject to the limitations of § 26–9(b),[14] but must pass through the hands of the candidate's treasurer and be reported as required in other provisions of this subtitle. Personal expenses of the candidate for filing fees, telegrams, telephoning, travel, and board, shall not be considered contributions if paid for by the candidate or his spouse.

*Id.*

Fifth, the treasurer must keep the funds in a campaign depository. *Id.* § 26–5(b).

Each candidate, political committee or central committee shall designate a campaign depository or depositories and all funds and contributions in furtherance of a candidacy, political committee or central committee shall, after receipt, be deposited by the treasurer or subtreasurer in the designated campaign depository in an account properly identifying the name of and the existence of the political candidacy, political committee or central committee. Except as provided in subsection (c),[15] a candidate, campaign treasurer or subtreasurer may not pay any expense on behalf of a candidate, directly or indirectly, and a political committee or central committee, including political clubs, may not pay any expense of such organization except by check from the designated depository.

*Id.* § 26–6(b).

Sixth, the candidate and his treasurer "shall file the report or statement of contributions and expenditures" as required by the Election Code. *Id.* § 26–11 (Supp.1989).

Seventh, and lastly, § 26–7(d) dictates that surplus funds do not return to the candidate.

(d) *Disposition of surplus funds.*—Prior to the time of filing the final report required by § 26–11 of this article, any surplus funds remaining after payment of all cam-

---

**14.** This section restricts the contributions and expenses of people who are not candidates.

**15.** *See supra* note 13 (petty cash fund).

paign expenditures shall be (1) returned, pro rata, to the contributors by the treasurer; or (2) paid to the State central committee of the party of which the candidate is a member or for which the political committee is acting; or (3) paid to a central committee of the party of which the candidate is a member or for which the political committee is acting so long as the central committee is located in a county in which the candidate resides or seeks to represent; or (4) paid to the local board of education or to a recognized nonprofit organization providing services or funds for the benefit of pupils or teachers; or (5) paid to a charitable organization registered pursuant to § 3–202 of Article 41 or to a charitable organization exempt from such registration pursuant to Article 41.

Reading these sections together, we come to several conclusions. Regarding statutory interpretation, the Court of Appeals notes that "[r]esultant conclusions are to be reasonable, logical and consistent with common sense." *State v. Bricker*, 321 Md. 86, 92, 581 A.2d 9 (1990). Cicoria was *not* the owner of the campaign funds in the Citizens for Cicoria bank account. Almost all campaign funds had to go through the treasurer of Citizens for Cicoria first.[16] Even Cicoria's personal monies, once he designated them for campaign purposes, had to flow through proper channels, be spent appropriately, and be accounted for. Moreover, upon the dissolution of Citizens for Cicoria, the remaining funds do not revert to Cicoria—even personal monies that he put into the campaign fund. Second, the treasurer was not the owner of the funds, but their channeling agent. The treasurer was the *steward* for Citizens for Cicoria. The Election Code requires that he deposit campaign monies in a special account—Citizens for Cicoria's account. Furthermore, the treasurer could only spend the money in Citizens for Cicoria's bank account in a way that would "promote or assist in the promotion of the success or defeat of" Cicoria's candidacy. Lastly, at trial, the State

---

**16.** Section 26–5(c) creates separate rules for petty cash expenditures.

presented evidence to support its position that Citizens for Cicoria owned the monies at issue in this lawsuit. Ms. Babinec, Director of Candidacy and Campaign Finance, State Administrative Board of Election Laws, testified about the ownership of campaign funds.

Q [Mr. Nevin for the State] When a continuing committee receives contributions, whose money is it?

A [Ms. Babinec] The committee's, the entity's.

Q Does the money personally belong to a candidate, treasurer or chairman?

A No.

Q Can a candidate, treasurer or chairman do anything they want with the money?

A No. Their activity is limited to campaign expenses.

Thus, all these factors point to Citizens for Cicoria as the entity which had "possession of or any other interest in the property involved...." Md.Ann.Code, art. 27, § 340(g) (1987 repl. vol.). Accordingly, we reject appellant's theory that he cannot steal from himself.

There is a dearth of authority on the issue of theft by a candidate from his campaign funds. *United States v. Pisani,* 773 F.2d 397 (2d Cir.1985), is the only case we could find that bears even the slightest factual similarity to the case at bar. In *Pisani,* the federal government charged Pisani, a New York State Senator, with tax evasion, mail fraud, and filing false tax returns. Some of the mail fraud charges dealt with Pisani converting monies from his election campaign fund to his personal use. On appeal, Pisani argued that "his use of campaign funds for personal purposes was not unlawful...." *Id.* at 407. On page 407 of the opinion, the court laid out that particular issue.

At the heart of this issue lies the question of whether New York law required Pisani to use moneys [sic] contributed to his campaign fund solely for campaign purposes, and prohibited him from putting them to personal use. The government contends that applicable New York law did not prohibit personal use of campaign funds, and

that Pisani's conceded use of some of them for personal purposes constituted embezzlement and conversion. Pisani contends, and we agree, that at the time of the events in question, nothing in New York law prohibited a candidate from using campaign funds for personal purposes.

Pisani used campaign funds for personal family and personal business expenses. *Id.* at 408. His campaign disclosure statements did not accurately reflect those expenditures. *Id.* Thus, his situation is similar to Mr. Cicoria's. At the time, however,

> [n]othing in this section [New York election laws] refer[red] to campaign committee funds or in any other way identifie[d] the source of the moneys [sic] from which expenditures may be made. The clear intent was to regulate what could be spent "in respect of any election[,]" and not to regulate or restrict a candidate's expenditures for nonelection purposes.

*Id.* at 410. After argument on Pisani's appeal, the New York legislature directly addressed the issue. New § 14–130 provides:

> Contributions received by a candidate or a political committee may be expended for any lawful purpose. Such funds shall not be converted by any person to a personal use which is unrelated to a political campaign or the holding of a public office or party position.

N.Y.Election Law § 14–130 (Consol.1986).

Maryland election laws are not as specific as New York laws on this particular point. But, Maryland law does specify that campaign contributions and expenditures are "to promote or assist in the promotion of the success or defeat of any candidate...." Md.Ann.Code art. 33, § 1–1(a)(5), (7) (Supp.1989). Mr. Cicoria may not be permitted to willfully or knowingly obtain or exert unauthorized control over property (funds) of his campaign committee, which control has the purpose of depriving the committee of that property (the funds) and the opportunity to promote the

success of his candidacy. The indictment, quite appropriately, alleged that he did "steal" money "from the campaign committee known as Citizens for Cicoria."

## B.

Cicoria advances the argument that the penalty provisions of the Election Code's section on Fair Election Practices are exclusive.[17] For example, § 26–20 provides that

[a]ny person who violates any of the provisions of this subtitle is guilty of a misdemeanor, and upon conviction shall be fined not more than one thousand dollars ($1,000.00), or be imprisoned for not more than one year, or both, in the discretion of the court. If a different penalty is specifically prescribed for violation of any section in this subtitle and expressly set forth therein, the specific penalty applies and the penalty set forth in this section does not apply.

Appellant is correct to point out that the Legislature has not provided for theft as an offense under the Election Code.[18] Cicoria, however, provides no authority to support his contentions that § 26–20 precludes the State from prosecuting him under other statutes or the common law for violations related to the elections arena. Our research of the legislative history reveals nothing that would support

---

**17.** Cicoria argues that the State is trying to "graft onto this statutory scheme a crime and a penalty...." We are aware of the legislative intent behind the Fair Election Practices section. "What the legislature intended by the 'Fair Election Practices Law,' as it had with its precursor, 'The Corrupt Practices Act,' as those subtitle names suggest, was the regulation and control of campaign financing and to insure a system of centralized responsibility for campaign funds and expenditures." *Parker v. Junior Press Printing Serv., Inc.,* 266 Md. 721, 726, 296 A.2d 377 (1972). We are using the Fair Election Practices section to determine who owned the funds at issue in this case. We are not grafting the theft statute onto the Election Code.

**18.** *See supra* note 9.

Cicoria's position.[19]

Looking to other jurisdictions, we find one case similar to the instant case. In *United States v. Hopkins*, 916 F.2d 207 (5th Cir.1990), the defendants circumvented the prohibition on corporate political contributions as regulated by the federal election laws. *See* 2 U.S.C. §§ 431–456 (1988). The defendants argued that the government should have prosecuted them only under the federal election laws (misdemeanor offenses), and not under Title 18 for fraud, concealment, and misapplication of funds (felonious offenses). *Hopkins*, 916 F.2d at 218. The court found their argument "meritless." *Id.* The court quoted from *United States v. Batchelder*, 442 U.S. 114, 99 S.Ct. at 2198, 60 L.Ed.2d 755 (1979). The United States Supreme Court stated that

---

**19.** *See* 1970 Md.Laws ch. 105, § 26–20; 1968 Md.Laws ch. 613, § 26–20; 1967 Md.Laws ch. 392, § 26–26; 1957 Md.Laws ch. 739, § 233; Legislative Counsel of Maryland, Reports of Legislative Committees to 1968 General Assembly; Legislative Counsel of Maryland, Reports of Legislative Committees to 1967 General Assembly; Legislative Counsel of Maryland, Reports of Legislative Committees to 1966 General Assembly; Legislative Counsel of Maryland, Reports of Legislative Committees to 1963 General Assembly; Legislative Counsel of Maryland, Reports of Legislative Committees to 1957 General Assembly. *See also* 1991 Md.Laws chs. 55, 449, 617; 1990 Md.Laws ch. 526; 1989 Md.Laws chs. 5, 288; 1988 Md.Laws chs. 598, 676; 1987 Md.Laws ch. 11; 1986 Md.Laws ch. 510; 1984 Md.Laws chs. 255, 285, 286; 1982 Md.Laws ch. 16; 1981 Md.Laws ch. 807; 1980 Md.Laws ch. 11; 1978 Md.Laws ch. 611; 1977 Md.Laws ch. 533; 1976 Md.Laws chs. 365, 378, 408, 418, 419, 582, 699; 1975 Md.Laws ch. 723; 1974 Md.Laws chs. 298, 341; 1973 Md.Laws chs. 249, 365, 779, 813; 1971 Md.Laws chs. 270, 352; 1970 Md.Laws ch. 28; 1969 Md.Laws ch. 281; 1968 Md. Laws chs. 187, 659; 1967 Md.Laws ch. 591; 1965 Md.Laws ch. 744; H.D. 1480, 1102, 488, 5, 1990 Sess.; 1548, 1390, 1389, 1387, 833, 167, 101, 95, 49, 1989 Sess.; 1394, 675, 1988 Sess.; 1118, 1117, 953, 832, 831, 40, 1987 Sess.; 1527, 1525, 1524, 1492, 819, 675, 41, 1986 Sess.; 1301, 981, 936, 1985 Sess.; 1329, 1070, 799, 92, 1984 Sess.; 1552, 1550, 1353, 750, 703, 371, 143, 1983 Sess.; 190, 1982 Sess.; 1250, 525, 292, 22, 1981 Sess.; 1569, 1980 Sess.; 1204, 609, 95; 1979 Sess.; 1894, 1893, 1612, 524, 411, 336, 265, 1978 Sess.; 96, 66, 62, 61, 1977 Sess.; H.D.J. 94, 1981 Sess.; S. 451, 1990 Sess.; 783, 748, 543, 1989 Sess.; 521, 497, 16, 1988 Sess.; 652, 650, 649, 648, 274, 99, 1987 Sess.; 953, 952, 867, 1986 Sess.; 323, 149, 30, 1985 Sess.; 383, 135, 1984 Sess.; 711, 527, 351, 1983 Sess.; 805, 410, 1980 Sess.; 851, 750, 1979 Sess.; 1152, 1128, 1978 Sess.; 259, 1977 Sess.

"when an act violates more than one criminal statute, the Government may prosecute under either so long as it does not discriminate against either class of defendants." *Id.* at 123–24, 99 S.Ct. at 2203–04. In addition, the court in *Hopkins* noted "[t]he only exception arises where Congress clearly intended that one statute supplant another; the fact that one statute is more specific than the other is not sufficient." *Hopkins*, 916 F.2d at 218. Furthermore, "nor does the fact that one statute prescribes a felony and the other prescribes a misdemeanor affect the prosecutor's authority to choose among statutes." *Id.*

> There is no indication in the federal election laws that Congress intended them to supplant the general criminal statutes. Moreover, the defendants in this case violated not only the election laws but also committed acts that constituted independent violations of the more general criminal statutes of Title 18. Conviction under those sections requires proof of elements not required to prove a violation of the election laws. The offenses under Title 18 thus stand wholly apart and separate from any violation of the federal election laws. The defendants' contention that they were improperly prosecuted under Title 18 is without support.

*Id.* at 218–19 (citation omitted).

Reading the Election Code, we do not find theft listed as an offense. Furthermore, comparing the Fair Election Practices sections of the Code with the theft statutes, we find the elements of theft as a crime differ from election law violations. Thus, absent any indication from the Legislature that § 26–20 precludes prosecution under other statutes or the common law, we hold that the State properly charged Mr. Cicoria with theft and conspiracy to commit theft.

Therefore, based on the discussions above, we hold that counts one and two charged cognizable offenses. *See Williams v. State*, 302 Md. 787, 791, 490 A.2d 1277 (1985).

## II.

### Did the State Prosecutor have the statutory authority to bring the charges in this case?

■ The record reflects that by letter dated March 8, 1990, Alexander Williams, Esquire, the State's Attorney for Prince George's County, requested the State Prosecutor, Stephen Montanarelli, Esquire, to proceed with the instant case. Mr. Williams took this action because, apparently, Judge Bowling dismissed the first indictment on the ground that the "State Prosecutor exceeded his statutory authority...."

■ The State Prosecutor may proceed under article 10, § 33B(b) or (c). On the facts in this case, his power comes from § 33B(c). That section deals with multi-jurisdictional criminal activity.

> At the request of either the Governor, Attorney General, General Assembly or a State's Attorney, the State Prosecutor may investigate criminal activity conducted or committed partly in this State and partly in another jurisdiction, or which is conducted or committed in more than one political subdivision of the State.

The filing of false tax returns is a multi-county offense. *Aud v. State*, 72 Md.App. 508, 531 A.2d 706 (1987), *cert. denied*, 311 Md. 557, 536 A.2d 664 (1988).

In *Goldberg v. State*, 315 Md. 653, 663–66, 556 A.2d 267, *cert. denied*, 493 U.S. 151, 110 S.Ct. 151, 107 L.Ed.2d 109 (1989), the Court of Appeals held that if an investigation deals with multi-county criminal activity and the proper authority empowers the prosecutor to act on the matter, then the prosecutor can appear before the Grand Jury. If an unauthorized person appears before the Grand Jury (before it issues an indictment), the court should grant a Motion to Dismiss the Indictment. *Id.* at 660.[20] In the present case, Mr. Williams, the State's Attorney for Prince

---

20. *Accord State v. Ensor,* 277 Md. 529, 356 A.2d 259 (1976); *Coblentz v. State,* 164 Md. 558, 166 A. 45 (1933).

George's County, specifically requested Mr. Montanarelli, the State Prosecutor, to appear before the Grand Jury. Therefore, under the authority of *Goldberg* and article 10, § 33B(c), the State Prosecutor properly appeared before the Grand Jury.

### III.

Did the court err by not dismissing Counts One and Two because those counts had been previously dismissed on the merits in a prior proceeding?

■ At a motions hearing on the first indictment, Judge Bowling dismissed some of the counts against Mr. Cicoria because the State Prosecutor exceeded his statutory authority.[21] Mr. Cicoria argues that the State should be bound by the principle of res judicata, and accordingly, should not have brought the second indictment against him.

"It is beyond question that the closely related doctrines of res judicata and collateral estoppel apply to criminal as well as civil causes." *Cook v. State*, 281 Md. 665, 668, 381 A.2d 671, *cert. denied*, 439 U.S. 839, 99 S.Ct. 126, 58 L.Ed.2d 136 (1978). As Judge Nalley noted at the motions hearing on September 5, 1990, the movant carries the burden of proving that the previous decision precludes the present action. *See Holloway v. State*, 14 Md.App. 703, 288 A.2d 652 (1972) (defendant did not produce sufficient evidence to support his Motion to Dismiss based on collateral estoppel).

Appellant did not furnish us with a transcript of Judge Bowling's motions hearing on the first indictment. Thus, we have no way of determining (other than the parties'

---

**21.** At the motions hearing on September 5, 1990, Mr. Touhey, counsel for Mrs. Cicoria, read into the record what Judge Bowling concluded about the State's Prosecutor's authority to appear before the Grand Jury. "The State Prosecutor exceeded his statutory authority in presenting Counts One through Six inclusive to the Grand Jury." Mr. Montanarelli's representations to Mr. Williams are in accord. "[T]he State Prosecutor exceeded his statutory authority...." Letter from Stephen Montanarelli, State Prosecutor, to Alexander Williams, State's Attorney for Prince George's County, Maryland (Mar. 2, 1990).

assertions) the grounds Judge Bowling used to dismiss certain counts of the first indictment. Nevertheless, to avoid further litigation, we address the issue. *See* Md.Rule 8–131(a).

"There is no question but that a criminal defendant may be indicted more than once for the same offense, ... and that any irregularity in a prior indictment may be corrected in a later indictment upon which a defendant may be tried...." *Irvin v. State*, 276 Md. 168, 172, 344 A.2d 418 (1975) (citation omitted). The State, however, may not indict the defendant at will. It is bound by principles of due process.

> In Maryland the State may either appeal the dismissal of an indictment or seek a new indictment or both so long as the State's action is not deemed to be oppressive and thus a possible violation of due process of law. In sum, the State must act in good faith.

*Irvin v. State*, 23 Md.App. 457, 463, 328 A.2d 329 (1974), *aff'd*, 276 Md. 168, 344 A.2d 418 (1975). Nothing in the record suggests that the State's actions (in reindicting Mr. Cicoria) were oppressive or a violation of due process of law. Therefore, we hold that the State did not violate the *Irvin* guidelines.

### IV.

Did the court erroneously admit evidence concerning a purported joint bank account when the State did not sufficiently prove that it was a joint bank account?

At trial, Judge Nalley admitted evidence concerning a bank account shared by Mr. and Mrs. Cicoria. The State proved that funds taken from Citizens for Cicoria's account (or intended for its account) were diverted and deposited into that joint bank account. Mr. Cicoria maintains that he is not listed on the account, and that the court committed reversible error by admitting evidence of the joint bank account. We disagree.

"Evidence is relevant if it tends to make a material issue in the case more probably true or untrue." *Jordan v. State,* 82 Md.App. 225, 239, 571 A.2d 238, *aff'd in part, rev'd in part,* 323 Md. 151, 591 A.2d 875 (1991). Nevertheless, the trial court may exclude evidence if its prejudicial effect substantially outweighs its probative value. *Id.* The trial judge has wide discretion when ruling on the relevance of the evidence. *Best v. State,* 79 Md.App. 241, 259, 556 A.2d 701, *cert. denied,* 317 Md. 70, 562 A.2d 718 (1989).

Ms. Mouzon, custodian of records at Sovran Bank, testified that account # 8524909 was opened in 1969. In 1977 Catherine Cicoria was the single owner of the account. But between 1977 and 1983, the bank added Mr. Cicoria's name to the account. Ms. Mouzon admitted that the bank does not have the original joint signature card with Mr. Cicoria's signature, *but the bank does have an "autosig" which is a photocopy of the signature card. Both Mr. and Mrs. Cicoria's signatures appear on the autosig.*

Mr. Cicoria suggests that account # 8524909 is a single account because the checks list only Mrs. Cicoria's name. Normally, both names in a joint account appear on a check, however, Ms. Mouzon pointed out that is not required. Thus, we hold that the lower court did not abuse its discretion by admitting evidence on the joint ownership status of account # 8524909.

## V.

Did the State prove a willful violation of the State Income Tax Laws despite Cicoria's good faith defense?

Appellant next alleges that a subjectively reasonable good faith belief will defeat a charge of tax evasion. *Cheeks v. United States,* —— U.S. ——, 111 S.Ct. 604, 611, 112 L.Ed.2d 617 (1991). His position is that Mrs. Cicoria "maintained the checkbook, paid the family bills, and had contact with the accountant who prepared the tax returns." Appellant argues that he "was clearly entitled to a Judgment of Acquittal...." He is wrong. Assuming, *arguen-*

*do,* that he did present evidence supporting a "good faith" defense, it was at best a jury question. If the jury failed to consider that defense, it was not due to judicial error, but was caused by appellant's failure to request the court to instruct the jury on the good faith defense.

Appellant goes on to argue that he was entitled to a jury instruction on his good faith defense claim. Assuming that he did make out a proper question for the jury, we look to Md.Rule 4–325(e) for guidance in this area.

> No party may assign as error the giving or the failure to give an instruction unless the party objects on the record promptly after the court instructs the jury, stating distinctly the matter to which the party objects and the grounds of the objection. Upon request of any party, the court shall receive objections out of the hearing of the jury. An appellate court, on its own initiative or on the suggestion of a party, may however take cognizance of any plain error in the instructions, material to the rights of the defendant, despite a failure to object.

The record indicates that Mr. Cicoria did not request a good faith defense instruction, or object to the court's instructions. Therefore, he waived any possible error. Further in the exercise of our discretion, we decline to hold that the lower court committed plain error in not, *sua sponte,* instructing the jury on his good faith claim. *See Tull v. State,* 230 Md. 152, 186 A.2d 205 (1962) (failure to instruct properly on the matter of self-defense was not "plain error").

## VI.

### Did the court err by not recusing itself at the trial of this case?

■ Lastly, appellant argues that Judge Nalley was "biased and prejudiced against him." To support his argument, appellant points out that Judge Nalley ordered him to provide handwriting exemplars and required him to "report to a probation officer pre-trial."

Apparently, appellant relies on Canon 3(C)(1)(a) of the Code of Judicial Conduct. "A judge should not participate in a proceeding in which the judge's impartiality might reasonably be questioned, including but not limited to instances where: (a) the judge has a personal bias or prejudice concerning a party or personal knowledge of disputed evidentiary facts concerning the proceeding." In *Boyd v. State*, 321 Md. 69, 86, 581 A.2d 1 (1990), the Court of Appeals favorably cited the test used by the United States Court of Appeals for the Second Circuit in *In re Drexel Burnham Lambert Inc.*, 861 F.2d 1307, 1313 (2d Cir.1988), *cert. denied*, 490 U.S. 1102, 109 S.Ct. 2458, 104 L.Ed.2d 1012 (1989), for the appearance of impropriety.

> [T]he test to be applied is an objective one which assumes that a reasonable person *knows and understands all the relevant facts.* [citations omitted.] We disagree with our dissenting colleague's statement that recusal based on an appearance of impropriety ... 'requires us to judge the situation from the viewpoint of the reasonable person, and not from a purely legalistic perspective.' Like all legal issues, judges determine appearance of impropriety—not by considering what a straw poll of the only partly informed man-in-the-street would show—but by examining the record facts and the law, and then deciding whether a reasonable person knowing and understanding all relevant facts would recuse the judge.

Our standard of review is abuse of discretion. *Boyd*, 321 Md. at 74, 581 A.2d 1. Appellant bears the burden of proof on this issue. *Carey v. State*, 43 Md.App. 246, 248–49, 405 A.2d 293 (1979), *cert. denied*, 445 U.S. 967, 100 S.Ct. 1660, 64 L.Ed.2d 244 (1980). He does not meet that burden.

First, Judge Nalley required Mr. Cicoria to report to his probation officer prior to trial. While that disturbed Mr. Cicoria, he fails to point out that Judge Nalley later rescinded that order at Mr. Cicoria's request.

Second, the judge denied Mr. Cicoria's request to postpone a handwriting analysis. Mr. Cicoria argues that the State did not timely file its request. The State attached its

Automatic Discovery and Request for Discovery to the indictment against Mr. Cicoria. Section 3(h) of that form asked that the defendant "provide specimens of his handwriting." Original counsel for Mr. Cicoria, Arnold Weiner, Esquire, and Thomas Zagami, Esquire, entered their appearances on April 5, 1990. The State sent Mr. Weiner a copy of the indictment and the State's Automatic Discovery and Request for Discovery on or about March 16. Based on the timing of events, it appears that the State provided Mr. Weiner with its discovery requests well before the clock even began to run. *See* Md.Rule 4–263(e). In effect, the State supplied Mr. Cicoria with more time to respond to its request. Furthermore, the lower court attempted to schedule a handwriting session on two prior occasions. We hold the lower court did not abuse its discretion by not recusing itself.

JUDGMENTS AFFIRMED; APPELLANT TO PAY THE COSTS.