766 A.2d 190

**Michael Sean HERBERT**

v.

**STATE of Maryland.**

**No. 3008, Sept. Term, 1999.**

Court of Special Appeals of Maryland.

Feb. 2, 2001.

Arthur A. DeLano, Jr., Assistant Public Defender (Stephen E. Harris, Public Defender, on the brief), Baltimore for appellant.

Diane E. Keller, Assistant Attorney General (J. Joseph Curran, Jr., Attorney General, Jason F. Trumpbour, Staff Attorney, Baltimore, and Michael C. Maloney, State's Attorney for Dorchester County, Cambridge, on the brief), for appellee.

Submitted Before MOYLAN,* KENNEY, VICTOR K. BUTANIS, (Specially Assigned), JJ.

MOYLAN, Judge.

The appellant, Michael Sean Herbert, was convicted in the Circuit Court for Dorchester County by Judge Donald F. Johnson, sitting without a jury, of 1) the possession of marijuana with the intent to distribute and 2) the possession of drug paraphernalia. On this appeal he raises the two contentions

1. that the evidence was legally insufficient to support the verdicts, and

2. that his motion to suppress the physical evidence was erroneously denied.

### Legal Sufficiency of the Evidence

We hold that the evidence was legally sufficient to support the verdicts. The appellant's argument as to evidentiary

---

* Moylan, J. participated in the hearing of this case while an active member of this Court; he participated in the conference and adoption of this opinion as a retired, specially assigned member of this Court.

insufficiency is two-fold. Primarily, he challenges the proof of his criminal agency generally. Secondarily, he challenges the establishment of the aggravating or incremental *mens rea* that the possession of the marijuana was with the intent to distribute it. We will address that secondary challenge first.

### Inference of an Intent to Distribute

■ When the search and seizure warrant was executed at Apartment A of 219 Willis Street in Cambridge on March 1, 1999, the police recovered, *inter alia*, 28.8 grams of marijuana. With respect to the significance of such an amount, Patrolman David Satterfield of the Narcotics Enforcement Team of the Cambridge Police Department testified:

> Just one other thing is this amount of marijuana found would be more than, through my training and experience, what a normal drug user would possess, and it was my belief that it was for distribution purposes.

Although the bulk of the marijuana was found in the living room, there was also a small amount of marijuana found in a cabinet in the kitchen. Next to it was a set of electronic scales. Marijuana residue was on the scales. Based on his "experience as a police officer trained in narcotics," Office Satterfield also concluded with respect to the scales:

> [T]he scale would be used to weigh out narcotics which drug dealers would use to weigh their narcotics and then package them for selling—to be able to have a price for the sale.

In the bedroom of the apartment, moreover, there was found, "lying loose on the bed," $500 in cash. Underneath the "box spring inside this bedroom" was found a further $12,000 in cash, wrapped neatly in packets of $1,000 each.

The appellant chooses to focus exclusively on the amount of marijuana recovered:

> One ounce of marijuana was found in a single baggie secreted under the pillow of the living room couch. The single one ounce baggie of marijuana was far more consistent with personal use than with an intent to distribute.

■ Although the quantity was legally sufficient, in and of itself, to permit an inference of the aggravating intent, it was not, to be sure, overwhelming. What the appellant conveniently ignores, however, is the $12,500 in cash and the electronic scales with marijuana residue. Pertinent is our observation in *Anaweck v. State*, 63 Md.App. 239, 254–55, 492 A.2d 658 (1985):

> The appellants were convicted not of simple possession, but of possession of cocaine with intent to distribute or dispense. *There are various ways to prove such intent.* The statutory language itself strongly suggests one route to the permitted inference of intent when it speaks of possession "in sufficient quantity to reasonably indicate under all circumstances an intent to manufacture, distribute, or dispense, a controlled dangerous substance." Art. 27, § 286(a)(1). *The quantity of narcotics possessed,* however, is not an end in itself; it *is but evidence of intent.* It is the intent itself that is critical. . . .

> Thus, even a large quantity of drugs might not yield a finding of intent to distribute, if other circumstances indicated large private consumption. *Conversely, a much smaller quantity might yield such finding of intent, if evidence other than the quantity possessed showed that intent.*

(Emphasis supplied). *See also Collins v. State,* 89 Md.App. 273, 279, 598 A.2d 8 (1991).

Here there was "evidence other than the quantity possessed [that] showed that intent." The incremental *mens rea* of an intent to distribute on the part of **SOMEONE** was abundantly established in this case.

### The Linkage Between
### The Appellant and the Contraband

■ The appellant's primary challenge is that the evidence was not legally sufficient to permit a finding that he was that **SOMEONE.** He seeks to distance himself from what was found in the search of 219 Willis Street.

When the police arrived to execute the search warrant at 5:40 p.m. on March 1, 1999, the appellant was one of two persons present on the premises. The other, Purnell Robert Bailey, had been sitting in the living room, smoking a marijuana cigar, immediately prior to the police arrival. Bailey bolted for the door, jettisoning the lighted cigar as he went, but was stopped in mid-flight. Both he and his cigar were taken into custody. The appellant had also been seated in the living room as the police arrived and as Bailey attempted to leave.

Our analysis begins with the principle that unlawful possession may be constructive as well as actual and may be joint as well as exclusive. As we observed in *Folk v. State,* 11 Md.App. 508, 511–12, 275 A.2d 184 (1971):

It is well-settled that *the proscribed possession of marijuana* or of narcotic drugs under the Maryland law *need not be sole possession. "[T]here may be joint possession and joint control in several persons.* And the duration of the possession and the quantity possessed are not material, nor is it necessary to prove ownership in the sense of title." *Jason v. State,* 9 Md.App. 102, 111, 262 A.2d 774. See also *Munger v. State,* 7 Md.App. 710, 256 A.2d 888; *Davis and Napier v. State,* 7 Md.App. 667, 256 A.2d 819; *Scott v. State,* 7 Md.App. 505, 256 A.2d 384; *Hernandez v. State,* 7 Md. App. 355, 255 A.2d 449; *Haley v. State,* 7 Md.App. 18, 253 A.2d 424; *Williams v. State,* 7 Md.App. 5, 252 A.2d 880.

Nor is it necessary, in order to be found in joint possession of a contraband drug, that the appellant have a "full partnership" in the contraband. . . .

*The Court of Appeals and this Court have on a number of occasions reviewed,* on the sufficiency of the evidence, *convictions of defendants who were not proved to be in direct physical possession or control of contraband drugs but were held to be in joint possession of those drugs.*

(Emphasis supplied).

In *Anaweck v. State,* 63 Md.App. at 242–43, 492 A.2d 658, this Court described the broad embrace of the crime of criminal possession:

*The appellants were not caught with the contraband in their hands. That,* of course, *is not legally fatal to proof of possession,* but it does at least make the burden of persuasion a heavier one. *Henson v. State,* 236 Md. 518, 525, 204 A.2d 516(1964); *Bryant v. State,* 229 Md. 531, 537, 185 A.2d 190 (1962). "Appellant's argument that the mere fact that narcotics were found in his apartment does not establish beyond a reasonable doubt that he put them there or that they were in his possession is without force." *Armwood v. State,* 229 Md. 565, 570, 185 A.2d 357 (1962). *"That the narcotics were not on his person but in the house of which he was a resident did not prevent the inference* the police and the trial court drew—*that he had possession and control of narcotics—from properly and permissibly being drawn." Henson v. State, supra,* 236 Md. at 524–525, 204 A.2d 516. It is also "well-settled *that the proscribed possession . . . of narcotic drugs under the Maryland law need not be sole possession." Folk v. State,* 11 Md.App. 508, 511, 275 A.2d 184 (1971). *"[T]here may be joint possession and joint control in several persons."*

(Emphasis supplied).

Before going on to the more significant linkage between the appellant and the premises of 219 Willis Street generally, we will linger for a moment on the contraband found in the living room alone. It was there that Purnell Bailey had been smoking the marijuana cigar. There were also recovered from that room "several burnt marijuana cigars." There was also in that room "some marijuana lying in plain view." In *Folk v. State, supra,* we surveyed a number of cases where convictions were sustained on the basis of constructive and/or joint possession of contraband. At 11 Md.App. at 518, 275 A.2d 184, we summarized:

The common thread running through all of these cases affirming joint possession is 1) proximity between the defendant and the contraband, 2) the fact that the contraband was within the view or otherwise within the knowledge of the defendant, 3) ownership or some possessory right in the premises or the automobile in which the contraband is

found, or 4) the presence of circumstances from which a reasonable inference could be drawn that the defendant was participating with others in the mutual use and enjoyment of the contraband.

## A. Proximity:

With respect to the proximity factor, the living room was small, there were only several chairs and other items of furniture in it, and the distance between the appellant and the various items of contraband was minimal. In comparable circumstances, we observed in *Folk v. State*, 11 Md.App. at 518, 275 A.2d 184:

> In the case at bar, *the proximity between the appellant and the marihuana could not be closer, short of direct proof that the appellant herself was in exclusive physical possession of the marihuana.* She was . . . literally within arm's length of every other occupant of that automobile. The marihuana cigarette being smoked was, at any point in time, within the direct physical possession of one of those occupants. *Proximity could not be more clearly established.*

(Emphasis supplied). As the appellant sat in his living room, he was in intimate proximity of 1) the marijuana cigar being smoked by Bailey, 2) the "several burnt marijuana cigars" strewn about the room, and 3) the unsmoked "marijuana lying in plain view."

## B. Knowledge of the Presence of Contraband:

The second *Folk* factor concerns the appellant's knowledge, through one sense or another, of the presence of contraband. With respect to the 28.8 grams of marijuana found in the living room, Officer Satterfield described it as "lying in plain view." We infer that the "burnt" marijuana cigars or "roaches," as well as the marijuana cigar being smoked by Bailey in his presence, were also within the clear view of the appellant. So much for the sense of sight.

The appellant also had to have been well aware of the presence of marijuana through his sense of smell. Officer Satterfield described being confronted by "a strong odor of

burnt marijuana" as he first entered 219 Willis Street. The appellant, of course, had been sitting in the living room with Bailey as the marijuana cigar was being smoked in his presence. In a comparable circumstance, we observed in *Folk v. State,* 11 Md.App. at 518, 275 A.2d 184:

Knowledge of the presence of marihuana would be imparted even more emphatically by the sense of smell, in a situation where the cloud of smoke and the peculiar pungent odor filled the interior of a tightly-closed automobile.

## C. Possessory Interest In The Premises:

Our consideration of the third *Folk* factor—the question of the appellant's "ownership or some possessory right in the premises ... in which the contraband is found"—will blend into our analysis of the larger linkage between the appellant and everything found in the search of 219 Willis Street. The evidence establishing the appellant's possessory interest in the property was, to be sure, largely circumstantial. That circumstantial evidence, however, convincingly identified the appellant as the person having the primary, if not indeed the exclusive, possessory interest in 219 Willis Street.

The appellant testified that he was a music producer and that Apartment A at 219 Willis Street was the studio out of which his production enterprise operated. He testified that there were "five or six" persons with access to the apartment, which testimony Judge Johnson was entitled to weigh as he chose or even utterly to disregard. The appellant's wife testified that she and the appellant and their daughter actually resided at 219 Willis Street for about a week in mid-December 1999, about ten weeks before the search of the property by Cambridge Police.

On the day of the search, the police had been conducting a surveillance of the property "all afternoon." With respect to the appellant, Officer Satterfield testified:

Well, he was in and out all afternoon that day. I observed him leave a couple times in a vehicle with whom I

believe a female companion back and forth, so, he was in and out all afternoon.

The appellant acknowledged to Officer Satterfield his connection with the property. Officer Satterfield testified:

Q: In your discussion with Mr. Herbert, did he tell you that he lived at that residence?

A: Yes.

Q: Okay, the residence, meaning—219 Willis Street.

A: Yes.

In the bedroom of the apartment, Officer Satterfield found documents and mail addressed to the appellant at 219 Willis Street:

THE COURT: And you had mentioned certain things being found in his bedroom. And how do you know it was his bedroom?

THE WITNESS: It was the only bedroom in the apartment, and we found—it was just documents that were located that put him with that address.

THE COURT: What specifically?

THE WITNESS: Just some miscellaneous mail with his name and his address on it.

With respect to similar evidence, *Anaweck v. State,* 63 Md.App. at 244–45, 492 A.2d 658, held:

There had been recovered in the course of the search, a bank statement from Patapsco Federal Savings and Loan Association in the names of Lena Anaweck and Edward Anaweck and giving their address as 2532 McComas Avenue. There was also a Baltimore Gas and Electric Company statement in the name of Edward Anaweck of 2532 McComas Avenue. It was clearly inferable that the suspect house was the home of Edward and Lena Anaweck.

When Purnell Bailey was called as a defense witness, he was asked where he was just prior to and at the time of the search of 219 Willis Street. Significantly, he replied:

I was over at Mr. Herbert's house.

## Beyond the Living Room:
## Constructive Possession

The establishment of the appellant as the primary, if not the exclusive, possessor of the apartment makes him criminally responsible for, *inter alia,* the contraband found in the kitchen. The only person in the apartment at the time of the search other than the appellant, Purnell Bailey, affirmatively disclaimed both having been in the kitchen and any knowledge of anything that was in the kitchen. The scale with marijuana residue was the subject matter of the unlawful possession of paraphernalia charge. It was a key piece of evidence, moreover, aggravating the unlawful possession of marijuana by adding the *mens rea* of an intent to distribute.

The search of the bedroom was even more damning to the appellant's claim of innocent unawareness. Although Bailey acknowledged having spent the night before the raid at "Mr. Herbert's house," he testified that he slept on the couch in the living room and never went into the bedroom. In the bedroom, small amounts of cocaine were found by the police both on top of the dresser and inside the dresser drawers. Most incriminating, of course, was the cash, $500 strewn on top of the bed and $12,000 hidden under the box spring, wrapped in bundles of $1,000 each.

### Inconsistent Stories and Incredible Testimony

At the time of the initial search, the appellant disclaimed all knowledge of the cash, the $500 and the $12,000. He claimed to have no idea to whom it belonged. By trial time, however, he sang a different tune. With respect to the $12,000, he stated simply:

[T]hat money right there belong to the record label. It's the money that we've accumulated over the last four years of selling songs, selling tapes, selling CDs.

He offered no explanation as to why a business enterprise would allow $12,000 of its capital to lie fallow under a mattress when, over a four-year period, it could have earned thousands

of dollars in interest. With respect to the $500 on top of the bed, he explained only that "my brother-in-law wanted to get another DAT machine."

The $12,500 was evidence of guilt in a variety of ways. In the first place, the inconsistency between the initial statement to the police and the trial testimony was in itself damaging. With respect to the substance of the testimony, an attempted explanation that beggars belief is far more damaging to one's cause than no explanation at all. The cash, moreover, was one of the key proofs escalating a mere possession into possession with intent to distribute. The presence of the cash in the bedroom also helped to clinch the connection between the appellant and the premises. It is inconceivable that he would have left $12,000 of money that was his, at least in significant part, under a box-spring in an apartment over which he had little or no control. The $500 would have been even more exposed absent the appellant's close control over the entire property.

The evidence was sufficient to establish the appellant's constructive, if not actual, possession of the contraband and the paraphernalia found at 219 Willis Street.

### The Suppression Hearing: What Was It About?

The more interesting of the appellant's two contentions is his claim that at the suppression hearing Judge Johnson erroneously failed to suppress the physical evidence recovered in the warranted house search of March 1, 1999. The almost exclusive thrust of the appellant's challenge at the suppression hearing, however, bore no resemblance to the challenge he now makes on appeal.

The appellant's present claim is that the failure of the State to introduce into evidence at the suppression hearing a copy of the application for the search warrant precluded Judge Johnson from finding that probable cause existed for the issuance of the warrant. Absent such a finding, the appellant now

argues, the warrant was presumptively bad, the search of 219 Willis Street was consequently bad, and the evidence should have been suppressed.

The actual proceedings at the suppression hearing, however, reveal a very different controversy then at center stage. At the suppression hearing, appellant's counsel took it for granted that all parties, including himself, had copies of the warrant application before them and were fully conversant with the application's substantive contents. There was no suggestion, moreover, that a reading of the application "within its four corners" would have revealed any lack of probable cause.

What the appellant seems to have been teetering toward, without ever plotting a clear or steady course in that direction, was some sort of "taint hearing" within the contemplation of *Franks v. Delaware*, 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978).[1] Without any preliminary argument or announce-

---

**1.** If a defendant qualifies for a "taint hearing" pursuant to *Franks*, he is then "permitted to attack the veracity of a warrant affidavit after the warrant has been issued and executed." 438 U.S. at 164, 98 S.Ct. 2674. The entitlement to a *Franks* hearing is to be strictly construed for as *Franks* itself pointed out, 438 U.S. at 167, 98 S.Ct. 2674:

[T]he rule announced today has a limited scope, both in regard to when exclusion of the seized evidence is mandated, and when a hearing on allegations of misstatements must be accorded.

Prior to *Franks*, the prevailing law in Maryland, since 1948, had been that the scrutiny of a warrant application, including supporting affidavits, had to be confined within "the four corners" of the supporting affidavit and that no challenge was permitted to the veracity of a warrant application and its supporting documents. *Tucker v. State*, 244 Md. 488, 499–500, 224 A.2d 111 (1966); *Burrell v. State*, 207 Md. 278, 280, 113 A.2d 884 (1955) ("[I]f the affidavit that forms the basis for the issuance of a search warrant is sufficient on its face, any question as to whether the affidavit showed probable cause is confined to the affidavit itself, and on a motion to quash the search warrant on the ground of lack of probable cause, no testimony can be received to contradict the truth of the allegations in the affidavit."); *Tischler v. State*, 206 Md. 386, 390–91, 111 A.2d 655 (1955) ("[T]he rule is so firmly established in Maryland that it should not be changed by a decision of this Court."); *Harris v. State*, 203 Md. 165, 172, 99 A.2d 725 (1953) ("The remedy prescribed by the statute in case of a false affidavit is prosecution for perjury, not impeachment of the affidavit."); *Adams v. State*, 200 Md. 133, 139, 88 A.2d 556 (1952); *Goss v. State*, 198 Md. 350, 354, 84 A.2d 57 (1951); *Smith v. State*, 191 Md. 329, 335–36, 62 A.2d 287 (1948)

ment of purpose, appellant's counsel proceeded to call five witnesses, including the appellant, to the stand.[2] The purport of that testimony was that during the entire week of February 14, 1999, the appellant had been in New York City and could not, therefore, have been in Cambridge, Maryland. At the conclusion of the testimony and virtually at the conclusion of the entire suppression hearing, counsel revealed the purpose of the testimony.

> Your Honor, with regard to the warrant, you have to look at the four corners of the warrant. And *the principal item in there is the fact, according to the affidavit, that during the week of February 14th that there was a controlled buy.*

(Emphasis supplied).

The tactical battle at the suppression hearing was cleanly joined although the larger strategic purpose was left completely unstated. It was accepted as a given fact by all parties that in his affidavit in support of the warrant application, Officer Satterfield had stated that at some time during the week of February 14, 1999, he monitored a controlled buy, using an informant, from 219 Willis Street. According to the story told

---

("We are of the opinion that any inquiry as to whether the affidavit, on which the search warrant was based, showed probable cause is confined to the affidavit alone and testimony should not be taken to controvert the truth of the allegations therein.").

This Court also consistently subscribed to the "four corners" doctrine. *Dawson v. State,* 11 Md.App. 694, 714–15, 276 A.2d 680 (1971); *Grimm v. State,* 7 Md.App. 491, 493, 256 A.2d 333 (1969); *Grimm v. State,* 6 Md.App. 321, 326, 251 A.2d 230 (1969); *Hall v. State,* 5 Md.App. 394, 397, 247 A.2d 548 (1968); *Sessoms v. State,* 3 Md.App. 293, 296–97, 239 A.2d 118 (1968); *Scarborough v. State,* 3 Md.App. 208, 211–12, 238 A.2d 297 (1968).

This body of law would still presumably be pertinent should a defendant be foolish enough to bring a search-and-seizure challenge only for a purported violation of Maryland law rather than for a purported violation of the federal Fourth Amendment.

2.  What the appellant thought he was doing is by no means clear. One does not just stumble into a *Franks* hearing casually, let alone inadvertently. That is why *Franks* makes repeated references to the fact that "a sensible threshold showing is required," 438 U.S. at 170, 98 S.Ct. 2674, and that the "requirement of a substantial preliminary showing should suffice to prevent the misuse of a veracity hearing," *id.* The appellant here did not even pause at the threshold.

to Officer Satterfield by the informant,[3] the buy was from the appellant himself. The five witnesses at the suppression hearing, including the appellant, sought to establish that the appellant had been in New York City during the entire week of February 14 and could not, therefore, have been a party to the controlled buy.

There was no dispute as to what substantively was in the warrant application. There was no dispute that, accepting its allegations as true, the warrant application established probable cause. The appellant was apparently attempting to establish through extrinsic evidence, presumably under *Franks v. Delaware*, that a key allegation in the warrant application was false and that the entire warrant application was thereby tainted. Arguably (although it was never argued), that controverting of the information in the affidavit could have been used in an effort to show not that Officer Satterfield was necessarily lying about having observed the controlled buy generally but at least that his informant was lying about having made the controlled buy from the appellant personally.[4]

The appellant, however, never made an argument based on *Franks v. Delaware.*[5] It is, therefore, unnecessary to point

---

3. The distinction between arguably false information from an affiant officer and arguably false information from a mere informant is critical. As *Franks* pointed out, 438 U.S. at 171, 98 S.Ct. 2674:

   The deliberate falsity or reckless disregard whose impeachment is permitted today is only that of the affiant, not of any nongovernmental informant.

4. Such a showing, of course, would have been inconsequential under *Franks.* See footnote 2, *supra.*

5. Not only did the appellant never mention *Franks v. Delaware* specifically or a "taint hearing" generally, he never attempted to make the threshold showing, required by *Franks,* even to be entitled to a hearing that went beyond argument confined to the "four corners" of the warrant application. *Franks,* 438 U.S. at 171–72, 98 S.Ct. 2674, is clear about the threshold requirement:

   To mandate an evidentiary hearing ... [t]here must be allegations of deliberate falsehood or of reckless disregard for the truth, and those allegations must be accompanied by an offer of proof. They should point out specifically the portion of the warrant affidavit that is

out the ways in which the appellant's possible *Franks v.
Delaware* argument, if indeed that is what he was intending to
make, was flawed [6] for that potential argument has now been
abandoned.

---

claimed to be false; and they should be accompanied by a statement
of supporting reasons. Affidavits or sworn or otherwise reliable
statements of witnesses should be furnished, or their absence satisfac-
torily explained. Allegations of negligence or innocent mistakes are
insufficient. The deliberate falsity or reckless disregard whose im-
peachment is permitted today is only that of the affiant, not of any
nongovernmental informant. Finally, if these requirements are met,
and if, when material that is the subject of the alleged falsity or
reckless disregard is set to one side, there remains sufficient content
in the warrant affidavit to support a finding of probable cause, no
hearing is required. On the other hand, if the remaining content is
insufficient, the defendant is entitled, under the Fourth and Four-
teenth Amendments, to his hearing. Whether he will prevail at that
hearing is, of course, another issue.

(Footnote omitted).

Someone, the State or the hearing judge or both, should have asked
appellant's counsel the obvious question:

For what conceivable purpose are you calling these witnesses?

You do not just start calling witnesses at a suppression hearing until
you have established the purpose for calling them.

6. Even if the appellant had requested a "taint hearing" pursuant to
*Franks* and had been entitled to such a hearing, he still would have had
a number of hurdles to surmount in order to prevail at such a hearing:

   1. Granting the fact finding hearing judge the prerogative of assess-
      ing the credibility of the witnesses and of weighing their testimo-
      ny to the extent that they were believed, he would have to have
      been persuaded that the appellant was not in Cambridge, Mary-
      land, during the week of February 14, 1999;

   2. Based on that finding and other competent evidence produced by
      the appellant, he would have to have been further persuaded that
      Officer Satterfield himself, and not merely his informant, had
      been guilty "of deliberate falsehood or of reckless disregard for
      the truth," 438 U.S. at 171, 98 S.Ct. 2674; and

   3. If the allegation about the controlled buy in the course of that
      week were "set to one side," the remaining information in the
      warrant application would not have been enough, in and of itself,
      to have established probable cause, 438 U.S. at 171–72, 98 S.Ct.
      2674.

The appellant never argued any of these things before Judge Johnson
and there was no compelling reason for Judge Johnson even to have
considered such matters, let alone to have been persuaded by them.

## A Sudden Tactical Shift

In response to an unforseen tactical opportunity, the defense suddenly shifted gears. As the moving party on the suppression motion, the appellant went first, as he should have, and called his five witnesses to make his case for suppression. When the appellant rested, Judge Johnson routinely inquired of the State if it had any witnesses to call. The State simply moved that the Motion to Suppress be denied based on the appellant's failure to carry his burden of proof.

[Prosecutor]: Your Honor, is the Court asking that I call witnesses at this time ... *I would argue that the motion be denied at this point because I do not believe that [the defense] has met its burden* [.]

The Court: When you say met its burden of showing what?

[Prosecutor]: Your Honor, the motion is to suppress the evidence ... suppression would be based on the search and seizure warrant. *I have just not heard any testimony that would show that the search and seizure warrant was applied for or executed in any bad faith.*

[Defense Counsel]: Your Honor, with regard to the warrant, you have to look at the four corners of the warrant. And *the principal item in there is the fact, according to the affidavit, that during the week of February 14*th *there was a controlled buy.*

(Emphasis supplied).

The unexpected development then occurred:

The Court: Okay, you say look at the four corners of the warrant, *I haven't seen the warrant ... it hasn't been introduced.*

[Defense Counsel]: The State's not going to—

\*　　\*　　\*

The Court: Okay. All right. So *I haven't really seen the warrant*[.]

---

The short answer, of course, is that the appellant is not even raising an issue with respect to any of this.

[Defense Counsel]: Well, *Your Honor, if the State's not going to introduce it. I move to dismiss it completely.*
[Prosecutor]: Your Honor, the State has not called any witnesses at this point.
The Court: ... [I]t was agreed at the beginning that there was a warrant.

\* \* \*

The Court: ... Although the search warrant was not introduced into evidence, *both counsel agreed that there was a search of the defendant's person and residence pursuant to a warrant. Considering the testimony that's been offered, the Court finds that the defendant has not proven a lack of probable cause or that the warrant was invalid; therefore, I deny the motion.*

(Emphasis supplied).

The issue now before the Court is singular and simple. The appellant argues for a *per se* rule that if the search in issue was executed pursuant to a warrant, the burden, at a suppression hearing, is allocated to the State to produce the warrant (including the application for the warrant) and the failure of the State to do so will compel the granting of a Motion to Suppress.

### The Appellant, As Well as the State, Had a Copy of the Warrant Application

Before we turn to that central issue of this appeal, two predicate facts need to be established to place our analysis in proper context. This is not a case where there was any lack of access by the appellant to the warrant or the warrant application. The appellant makes no suggestion of any complaint in that regard. The compelling inference is that the appellant was in full possession of photocopies of the warrant, the warrant application, and Officer Satterfield's supporting affidavit just as surely as was the State.

The search warrant itself expressly commanded the executing officer to "leave a copy of the application, affidavit and

warrant with an inventory, if any" with the person found on the premises. There was no hint of any failure by the State in that regard.

Maryland Rule 4–263(a)(2) requires:

**Disclosure without request.** Without the necessity of a request, the State's Attorney shall furnish to the defendant:

(2) Any relevant material or information regarding: (A) specific searches and seizures[.]

There has similarly been no suggestion that the State did not comply with the mandatory discovery requirements in this case. Indeed, the State's Automatic Discovery of April 12, 1999, expressly recited, in paragraph 2, that "any relevant material" with respect to "a search and seizure" was "attached hereto."

The appellant's Demand for a Bill of Particulars of April 14, 1999, further revealed a minute and precise knowledge of what was in Officer Satterfield's supporting affidavit as it probed for additional details:

### *SEARCH WARRANT AFFIDAVIT*

1. The specific date and time that Patrolman First Class David A. Satterfield allegedly witnessed the Defendant exchange substance for currency with unknown subjects.

2. The automobile tag number and the registered owners of the vehicles given to PFC Satterfield by citizens and the dates and times that persons in these vehicles allegedly visited 219 Willis Street, Cambridge, Maryland, and the names of the individuals who supplied the information to PFC Satterfield.

3. The names of all individuals who reside at 219 Willis Street, Cambridge, Maryland.

4. The specific date and time during the week of February 14, 1999, that the alleged controlled buy orchestrated by PFC Satterfield occurred at 219 Willis Street, Cambridge, Maryland.

The first request—concerning observations of the appellant exchanging "substance for currency with unknown subjects"—had reference to observations made by Officer Satterfield during the week of January 24, 1999, and were part of his affidavit. The second request demanded more specificity about "25 different tag numbers" by "two concerned citizens" over "a two week period" again revealing precise and detailed knowledge of the contents of Officer Satterfield's affidavit. The fourth request concerned the controlled buy during the week of February 14 that was the key allegation in that affidavit. Three separate demands for particulars revealed an intimate, line-by-line familiarity with the warrant application and its supporting affidavit.

The entire conduct of the suppression hearing, moreover, made it clear that the appellant had before him copies of the warrant, the warrant application, and Officer Satterfield's supporting affidavit. This is not a case where the defendant was denied photocopies of all pertinent documents relating to the search and seizure or where the State had exclusive control or possession of the documents the defense sought to have introduced into evidence.

### The Essential Equality
### Of Duplicate Originals

Being fully satisfied that the appellant had all of the pertinent documents before him at the trial table, the second predicate fact that needs to be established is that, for purposes of the suppression hearing in this case, the appellant's copies of the pertinent documents were just as admissible as were the State's.

We are dealing with what is generally called a "duplicate" or sometimes "duplicate original." Md.Code Ann., Courts and Judicial Proceedings, Sect. 10–103(a)(4) defines a "duplicate":

"Duplicate" means a counterpart produced by the same impression as the original, or from the same matrix, or by means of photography, including enlargements and miniatures, or by mechanical or electronic recording, or by chemi-

cal reproduction, or by other equivalent techniques which accurately reproduce the original.

Subsection (b) of that provision continues:

[a] duplicate is admissible in evidence to the same extent as an original unless:

(1) A genuine question is raised as to the authenticity of the original; or

(2) Under the circumstances, it would be unfair to admit the duplicate in lieu of the original.

There was no question raised in this case as to the "authenticity" of the original warrant. Neither were there any circumstances that would have made it "unfair to admit the duplicate in lieu of the original."

Those provisions of Sect. 10–103 have been embodied, since the codification of the evidence rules in 1994, in Maryland Rule of Evidence 5–1003, entitled "Admissibility of Duplicates":

*A duplicate is admissible to the same extent as an original* unless (1) a genuine question is raised as to the authenticity of the original or (2) in the circumstances, it would be unfair to admit the duplicate in lieu of the original.

(Emphasis supplied).

In *Thompson v. State,* 62 Md.App. 190, 209, 488 A.2d 995, *cert. denied,* 303 Md. 471, 494 A.2d 939 (1985), this Court held that unless the authenticity of the original warrant had been called into question, a photocopy of a warrant is just as admissible as the original warrant itself.

The appellant would like to take advantage of the fact that only a copy instead of the original document was offered to the court, but he fails utterly to relate his objections to any possible undergirding purpose that this evidentiary rule of preference was designed to serve. There was in this case no issue raised as to the contents of the search warrant itself.

**480**

In *State v. Brown,* 129 Md.App. 517, 526, 743 A.2d 262 (1999), we again held that a duplicate original of a warrant was "no different than the original [warrant] itself."

In the instant case neither the statute nor the rules were offended. *The "duplicate" original submitted to the trial court was, for the purpose of the "Best Evidence Rule," no different than the original itself.* Professor McClain notes that "in most circumstances, a duplicate copy made by a machine, such as a photocopier, will be admissible to the same extent as the original." *McClain, supra,* at § 1001.1 p. 523,; *see also Hartford v. Scarlett Harbor,* 109 Md.App. 217, 264, 674 A.2d 106 (1996), *aff'd,* 346 Md. 122, 695 A.2d 153 (1997) ("The photocopy of the amendment, in turn, was admissible under the exception to the best evidence rule for photographic duplicates.' "); *Cicoria v. State,* 89 Md.App. 403, 425, 598 A.2d 771 (1991), *aff'd,* 332 Md. 21, 629 A.2d 742 (1993).

(Emphasis supplied).

In *State v. Brown* the defendant, as here, failed to show any reason why a duplicate original would not have been just as admissible as the original warrant itself. Under those circumstances we concluded, 129 Md.App. at 527, 743 A.2d 262:

Here, the appellee presented no justification as to why the "duplicate original" should not have been admitted. He failed to show, as both the rule and the statute require, that either (1) a genuine question existed as to the warrant's authenticity . . . or (2) it would have been unfair to admit the duplicate in lieu of the original.

Under the "Best Evidence Rule," *the photocopy of the bench warrant was admissible to the same extent as the original.* If applicable, the "Best Evidence Rule" was satisfied.

(Emphasis supplied).

The appellant's reliance on *Campofreda v. State,* 15 Md. App. 693, 292 A.2d 703 (1972), for the proposition that a photocopy is not as good as the original is misplaced. *Campofreda* is readily distinguishable in that the "copy" in that

case of both the warrant application and the warrant was totally blank with respect to 1) the name of the issuing judge, 2) any subscription or notarization of the purported affidavit, 3) the name of the officer to whom the warrant was directed, 4) the date the warrant was issued, and 5) any signature by the issuing judge.

To the extent, however, to which any language in the *Campofreda* opinion may be read to suggest that even a more complete copy would somehow still run afoul of the Best Evidence Rule, such a reading is hereby expressly disavowed. *Campofreda* was decided before Courts and Judicial Proceedings Article, Sect. 10–103 was adopted by ch. 720 of the Acts of 1981 and before Maryland Rule of Evidence 5–1003 was promulgated by the Court of Appeals, to be effective on July 1, 1994. The reading the appellant would give to *Campofreda,* moreover, is completely incompatible with the express holdings of this Court in *Thompson v. State, supra; State v. Brown, supra; Hartford v. Scarlett Harbor,* 109 Md.App. 217, 264, 674 A.2d 106 (1996), *aff'd,* 346 Md. 122, 695 A.2d 153 (1997); *Cicoria v. State,* 89 Md.App. 403, 425, 598 A.2d 771 (1991), *aff'd,* 332 Md. 21, 629 A.2d 742 (1993).

As we approach the issue of the burden of production at a suppression hearing, therefore, we are now satisfied 1) that the appellant had accurate photocopies of the search warrant, the warrant application, and the supporting affidavit of Officer Satterfield; and 2) that the appellant's copies were just as admissible at the hearing as the copies or the originals in the apparent possession of the State.

## The Allocation of the Burdens of Proof At a Suppression Hearing

As a general rule, the moving party on any proposition, civil or criminal, has both the burden of production and the burden of persuasion. It is the moving party who attempts to persuade a judge somehow to alter the *status quo.*

In a criminal trial, the *status quo*—the norm—is that evidence of a defendant's guilt that is relevant, material, and competent will be admitted. It is the defendant who seeks to alter that *status quo*—who seeks a departure from that norm—when he seeks to exclude relevant, material, and competent evidence of guilt in order to serve some extrinsic purpose, such as deterring the police from future unreasonable searches and seizures. *Mapp v. Ohio,* 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961). To the moving party is allocated the burden of making the case for such an alteration of the *status quo*-for such a departure from the norm.

*Rawlings v. Kentucky,* 448 U.S. 98, 104, 100 S.Ct. 2556, 65 L.Ed.2d 633 (1980), spoke to the allocation of the burden:

> Petitioner, of course, bears the burden of proving . . . that the search . . . was illegal.

On the closely related threshold issue of Fourth Amendment standing to object, the Supreme Court in *Rakas v. Illinois,* 439 U.S. 128, 130 n. 1, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978), made that initial allocation of the burden very clear.

> The proponent of a motion to suppress has the burden of establishing that his own Fourth Amendment rights were violated by the challenged search or seizure.

On the same analogous threshold issue, this Court confirmed that allocation of the burden in *Thompson v. State,* 62 Md.App. 190, 202–03, 488 A.2d 995 (1985):

> [I]t is clear that the burden of proof is allocated to the defendant to show his standing. The State has no obligation to show nonstanding.

See also *Ruffin v. State,* 77 Md.App. 93, 96, 549 A.2d 411 (1988); *Coomes v. State,* 74 Md.App. 377, 391, 537 A.2d 1208 (1988); *Bates v. State,* 64 Md.App. 279, 283, 494 A.2d 976 (1985).

We pointed out in *Duncan and Smith v. State,* 27 Md.App. 302, 313, 340 A.2d 722 (1975), how the allocation to the defendant on the threshold issue of standing is but an instance

of the allocation of the burden of proof generally to the moving party.

> This allocation of the burden on the question of standing is simply a particular instance of the general truth that *he who pleads and asserts the affirmative of an issue has the burden of proving that issue and fails at his peril. It is a defendant who moves to suppress evidence and must give the court some basis for granting the motion.*

(Emphasis supplied).

In *Cecil Jones v. United States,* 362 U.S. 257, 261, 80 S.Ct. 725, 4 L.Ed.2d 697 (1960), the Supreme Court spoke to that same effect.

> *[I]t is entirely proper to require of one who seeks to challenge the legality of a search* as the basis for suppressing relevant evidence *that he allege, and* if the allegation be disputed that he *establish, that he himself was the victim of an invasion of privacy.*

(Emphasis supplied). See also *Nardone v. United States,* 308 U.S. 338, 341, 60 S.Ct. 266, 84 L.Ed. 307 (1939); *Alderman v. United States,* 394 U.S. 165, 173–74, 89 S.Ct. 961, 22 L.Ed.2d 176 (1969); *Simmons v. United States,* 390 U.S. 377, 389–91, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968).

In *Duncan and Smith v. State,* 27 Md.App. at 315, 340 A.2d 722, we quoted with approval from Abbott, *Law and Tactics at Exclusionary Hearings,* (1969), pp. 107–08, with respect to the allocation of the burden of production:

> "*The burden of going forward with evidence at an exclusionary hearing is clearly upon the defendant. The defendant is the moving party and should be the first to introduce evidence under any rule of orderly procedure.* Furthermore, compliance with this requirement alerts the hearing court to the nature and extent of the claimed illegal conduct. . . . *If the defense fails to sustain its burden of going forward, the court may deny the motion.*"

(Emphasis supplied). We further, 27 Md.App. at 315–16, 340 A.2d 722, quoted with approval from Abbott, p. 110, with respect to the allocation of the burden of ultimate persuasion.

> *"The burden of persuasion 'remains throughout upon the one who at the outset has asserted the affirmative of the issue.'* At an exclusionary hearing the defense has asserted the affirmative because it has requested the court to suppress certain evidence.* Thus, unless the government has been specially assigned the burden under a particular exclusionary rule [as in the case of a confession], *the defense has the obligation to persuade the hearing judge* at the conclusion of all the evidence *that the facts are such as to require a granting of the motion."*

(Brackets in original; emphasis supplied).

The State, though it may choose to react to such an effort, is not required to do anything. It does not automatically assume any risk of non-production or of non-persuasion. It is entitled to be an interested but completely passive party to such a proceeding. It is the defendant who must make a case for the suppression of evidence. The State is not required to make a case for the non-suppression of evidence. If a judge should convene a suppression hearing and if both parties should rest without saying a word, the State would win that nothing-to-nothing tie. More precisely stated, the defendant would lose the nothing-to-nothing tie. *Duncan and Smith v. State,* 27 Md.App. at 317, 340 A.2d 722.

In law, of course, there are no ties because of a device called the allocation of the burden of proof. The party to whom is allocated the burden of proof is, *ipso facto,* the loser of what may appear to be a tie. More precisely, what appears to be a tie is the failure of the party with the burden successfully to carry that burden.

The State's position may be quintessentially that of a debater for the negative, with nothing to prove and completely content, therefore, merely to observe (or, perhaps, to point out) the failure of proof on the part of the moving party. It would be perfectly proper for the State to say:

> "Your Honor, I am not here to try to persuade you to do anything. I did not ask for this hearing and, indeed, am here only as a courtesy to the court. I am happy with the

*status quo* and have no desire for you to change it in any way. I am content to have the court adjourn with having done nothing."

When one is not the moving party, such a stance makes eminently good sense. That is what the State did in this case.

## The Strong Preference for the Warrant And Its Practical Consequences

■ The critical fact in this case is that at the suppression hearing, it was the appellant who bore the burden of production. It behooves us to explain why the burden of production was thus allocated.

Although the initial burden of production (of going forward)is always on the defendant, there are circumstances with respect to the Fourth Amendment merits which, if established, may trigger an evidentiary presumption that operates to shift the burdens of both production and persuasion. The very possibility of such a shift is a direct consequence of the Supreme Court's strong preference for searches and seizures pursuant to judicially approved warrants over warrantless searches and seizures. The preference-sometimes referred to as "The Centrality of the Warrant Requirement"—was articulately stated in *Katz v. United States,* 389 U.S. 347, 357, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967):

> Over and over again this Court has emphasized that the mandate of the Fourth Amendment requires adherence to judicial processes, and that searches conducted outside the judicial process, without prior approval by judge or magistrate, are *per se* unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions.

(Internal citations and footnote omitted). See also *Coolidge v. New Hampshire,* 403 U.S. 443, 454–44, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971); *Cecil Jones v. United States,* 362 U.S. 257, 270–71, 80 S.Ct. 725, 4 L.Ed.2d 697 (1960).

The principle undergirding the preference for warrants was most forcefully stated by Justice Robert Jackson in *Johnson v. United States,* 333 U.S. 10, 13–14, 68 S.Ct. 367, 92 L.Ed. 436 (1948):

> The point of the Fourth Amendment, which often is not grasped by zealous officers, is not that it denies law enforcement the support of the usual inferences which reasonable men draw from evidence. *Its protection consists in requiring that those inferences be drawn by a neutral and detached magistrate instead of being judged by the officer engaged in the often competitive enterprise of ferreting out crime.* ... When the right of privacy must reasonably yield to the right of search is, as a rule, to be decided by a judicial officer, not by a policeman or government enforcement agent.

(Emphasis supplied).

The animating philosophy is that balls and strikes should be called by a neutral umpire or referee—in our context by a member of the third branch of government—rather than by a member of the investigative team. The only reason an otherwise impeccable search warrant was struck down in *Coolidge v. New Hampshire,* for instance, was because it was signed by the Attorney General of the State, who inherently could not, as an executive officer charged with enforcing the criminal law, bring to bear on the Fourth Amendment concern the same degree of neutrality and detachment routinely available in a disinterested judge or magistrate. 403 U.S. at 449–53, 91 S.Ct. 2022.

Over the course of decades, the Supreme Court has not been content to deliver to American prosecutors and American police a schoolmarmish civics lesson or lecture on investigative restraint. It has, in an exercise of shrewd practicality, provided prosecutors and police with significant incentives for searching and seizing via the favored or preferred modality, to wit, with judicially issued warrants. Conversely, it has strewn the field with at times vexing disincentives for operating in the disfavored or non-preferred modality, to wit, warrantlessly.

The Introduction to William W. Greenhalgh, *The Fourth Amendment Handbook,* Criminal Justice Section of the American Bar Association (1995), p. 9, describes the sage deployment of "the stick and the carrot" by the Supreme Court:

> In encouraging the police to act in the preferred warranted mode rather than in the nonpreferred warrantless mode, the Supreme Court has, in a very practical way, "put its money where its mouth is." It has given law enforcement an "edge" when it takes the trouble to investigate in the preferred manner.... In a variety of ways, law enforcement has been given *a bonus for relying on* such *warrants.*

(Emphasis supplied).

## A. Multiple Ways of Avoiding Suppression:

That "bonus for relying on ... warrants" has manifested itself in at least four very practical ways. The first is that the officer who searches and seizes with a warrant may get two (or three or four) bites out of the apple. If at a suppression hearing the State prevails because its search warrant is ruled to have been valid, all is well. Even if the warrant round is lost, however, the State may still, as a fallback position, rely on one or more exceptions to the warrant requirement as alternative ways of salvaging the search in question.

In *Coolidge v. New Hampshire,* for instance, the State's first line of defense was that its search warrant was valid, 403 U.S. at 449–53, 91 S.Ct. 2022. Even after the State failed in that effort, it was still permitted to argue that the search, even if treated as warrantless, was nonetheless valid pursuant to various exceptions of the warrant requirement. The State argued that even as a warrantless search, it was still 1) a good search incident to lawful arrest, 403 U.S. at 455–57, 91 S.Ct. 2022; 2) a good warrantless automobile search pursuant to the *Carroll* Doctrine, 403 U.S. at 458–64, 91 S.Ct. 2022; 3) a good warrantless seizure under the Plain View Doctrine, 403 U.S. at 464–73, 91 S.Ct. 2022; and 4) a search lawfully consented to by the defendant's wife, 403 U.S. at 487–90, 91 S.Ct. 2022. The State has a distinct "edge" when it has multiple theories by which it may prevail. A "savvy" investigator should always

want to have an "edge" and the Supreme Court has recognized the value to the police of such a street-wise incentive.

## B.   "Good Faith" Exception to the Exclusionary Rule:

A second strong incentive for searching with warrants is the almost "fail-safe" security of being able to fall back on the "good faith" exception to the Exclusionary Rule. *Massachusetts v. Sheppard,* 468 U.S. 981, 104 S.Ct. 3424, 82 L.Ed.2d 737 (1984); *United States v. Leon,* 468 U.S. 897, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984).  Even when the warrant is bad, the mere exercise of having obtained it will salvage all but the rarest and most outrageous of warranted searches.  The "good faith" exception, by contrast, is almost universally unavailable in warrantless contexts.  See *Arizona v. Evans,* 514 U.S. 1, 115 S.Ct. 1185, 131 L.Ed.2d 34 (1995).  Under the *Sheppard–Leon* "good faith" exception to the Exclusionary Rule, it is hard for the State to lose a suppression hearing.  It is equally hard to figure out why the State would not do everything in its power to exploit that overwhelming advantage whenever possible.

## C.   Winning the "Close Calls" On Probable Cause:

A third practical incentive for prosecutors and police to search, whenever possible, with warrants is the clear signal from the Supreme Court to the reviewing judicial referees to give the State the benefit of the "close calls" when a search warrant is in issue but, conversely, to deny the State the "close calls" in warrantless contexts.  In reviewing warrants generally, *United States v. Ventresca,* 380 U.S. 102, 108, 85 S.Ct. 741, 13 L.Ed.2d 684 (1965), has counseled the reviewers:

These decisions reflect the recognition that *the Fourth Amendment's commands,* like all constitutional requirements, *are practical* and not abstract.  If the teachings of the Court's cases are to be followed and the constitutional policy served, affidavits for search warrants, such as the one involved here, must be tested and interpreted by magistrates and courts in a common-sense and realistic fashion. They are normally drafted by nonlawyers in the midst and haste of a criminal investigation.  Technical requirements of

elaborate specificity once exacted under common law pleading have no proper place in this area. *A grudging or negative attitude by reviewing courts toward warrants will tend to discourage police officers from submitting their evidence to a judicial officer before acting.*

(Emphasis supplied). See also *Tucker v. State,* 244 Md. 488, 497, 224 A.2d 111 (1966); *Henderson v. State,* 243 Md. 342, 346, 221 A.2d 76 (1966).

*Illinois v. Gates,* 462 U.S. 213, 236, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983), similarly recommended a latitudinarian judicial approach to the process of reviewing warrants:

*If the affidavits submitted by police officers are subjected to the type of scrutiny some courts have deemed appropriate, police might well resort to warrantless searches,* with the hope of relying on consent or some other exception to the Warrant Clause that might develop at the time of the search.... Reflecting this preference for the warrant process, the traditional standard of review of an issuing magistrate's probable-cause determination has been that so long as the magistrate had a "substantial basis for ... conclud[ing]" that a search would uncover evidence of wrongdoing, the Fourth Amendment requires no more. *We think reaffirmation of this standard better serves the purpose of encouraging recourse to the warrant procedure*[.]

(Internal citations omitted; emphasis supplied). The Supreme Court's purpose could not have been more clear. As *Illinois v. Gates* expressed it, 462 U.S. at 237 n. 10, 103 S.Ct. 2317:

*[T]he preference* to be accorded to warrants ... *reflects* ... *a desire to encourage* use of the warrant process by *police officers.*

(Emphasis supplied). The Supreme Court is telling judges generally to use "straight talk" with American police officers, convincing them that it will be "to their advantage" whenever they take the trouble to get warrants.

The incentive of having the "close calls" go in one's favor is particularly strong when fine balances of probable cause are

on the scales. Although there is a tendency to think, with Gertrude Stein, that probable cause is probable cause is probable cause, the reality is not always that clear-cut. When the probable cause issue is right on the cusp, when it teeters at the brink and could be nudged in either direction by a feather, the Fourth Amendment's preference for warrants asserts itself as the critical tie-breaker. Most frequently, to be sure, the "call" as to probable cause will be "up" or "down" regardless of the investigative modality. Statistically, however, there will be enough agonizingly close calls over the course of an investigation season to make it a pronounced advantage to hold the tie-breaker in one's pocket.

The likelihood that the scales might be weighted in one direction or the other, thereby manifesting the reviewing court's approval or disapproval, appeared as handwriting on the wall as early as *Johnson v. United States,* 333 U.S. 10, 13–14, 68 S.Ct. 367, 92 L.Ed. 436 (1948):

> Any assumption that evidence sufficient to support a magistrate's disinterested determination to issue a search warrant will justify the officers in making a search without a warrant would reduce the Amendment to a nullity and leave the people's homes secure only in the discretion of police officers.

If probable cause were a mathematical immutability, those words would be pointless.

*Aguilar v. Texas,* 378 U.S. 108, 111, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964), made clear that the quantum of suspicion that will suffice in one investigative setting will not carry the day in the other:

> [W]hen a search is based upon a magistrate's, rather than a police officer's, determination of probable cause, *the reviewing courts will accept evidence of a less "judicially competent or persuasive character* than would have justified an officer in acting on his own without a warrant."

(Emphasis supplied).

*United States v. Ventresca,* 380 U.S. 102, 109, 85 S.Ct. 741, 13 L.Ed.2d 684 (1965), also made reference to this tie-breaking function:

Although in a particular case it may not be easy to determine when an affidavit demonstrates the existence of probable cause, *the resolution of doubtful or marginal cases in this area should be largely determined by the preference to be accorded to warrants.*

(Emphasis supplied). The preference clearly influences the measurement.

Greenhalgh, *Fourth Amendment Handbook,* p. 9, also refers to the shifting standard of measurement:

[I]n a marginal case that could go either way, the quantum of suspicion that will qualify as probable cause in the context of a warrant review is less than that which may be required to support warrantless activity.

Sitting *en banc* in *Hignut v. State,* 17 Md.App. 399, 413, 303 A.2d 173 (1973), this Court subscribed to the principle of backing up the judicial preference for warrants by providing the practical incentive of a favorable tie-breaker:

We are admonished, in the interests of enhancing the Fourth Amendment protections, to "accept evidence of a less 'judicially competent or persuasive character than would have justified an officer in acting on his own without a warrant.' " . . . Under that mandate, *the furthering of valuable liberties under the Fourth Amendment requires that we read possibly ambiguous language with an eye toward upholding the warrant rather than toward striking it down.*

(Emphasis supplied).

The three preceding incentive/disincentive dichotomies have no direct bearing on the precise issue now before us. The fourth, however, because of its possible impact on the burden of production will be very material.

### D. A Warrant Application's Presumption of Validity:

The fourth and the most interesting, because the least extensively explored, of the Supreme Court's incentives to prosecutors and police to resort, whenever possible, to the warrant process is the **presumption of validity** that attends a warrant application. *Franks v. Delaware,* 438 U.S. 154, 171,

98 S.Ct. 2674, 57 L.Ed.2d 667 (1978), spoke of the presumption:

> There is, of course, *a presumption of validity* with respect to the affidavit supporting the search warrant.

(Emphasis supplied). It is, of course, in the warrant application that probable cause must be spelled out. What is the legal significance, therefore, of a presumption of validity? The word "presumption" is a precise term of art. It is a substitute for proof. The party enjoying a presumption is entitled to rest on that presumption.

■ Once again, the Supreme Court has provided an incentive for searching with a warrant and a disincentive for searching warrantlessly. What are affected by this incentive/disincentive combination are the burdens of proof at a suppression hearing. When the State has procured evidence of guilt by the favored and preferred modality of a warranted search, it is rewarded by a presumption of validity in favor of its warrant application. Let the fact be once established or otherwise accepted that the search in issue was pursuant to a judicially issued warrant and the State is then entitled to the presumption. Because it is the State that enjoys the presumption, the burden is allocated to the defendant to rebut it, if he can.[7]

The reason the State does not have to produce the warrant application is because the State does not have to prove that the warrant application establishes probable cause; the defendant, rather, must prove that the warrant application fails to establish probable cause. This is the obverse, to wit, "heads," of the incentive/disincentive coin. There is an obvious and ominous implication here for the bearer of the burden of production because the reviewing judge will be severely handi-

---

7. This is totally unlike the allocation of the burdens when it comes to a challenged confession. Once a defendant has challenged a proffered confession, there is allocated to the State the burden of establishing its admissibility. The State enjoys no presumption of validity. *Kidd v. State*, 33 Md.App. 445, 465–66, 366 A.2d 761 (1976), *aff'd*, 281 Md. 32, 375 A.2d 1105 (1977).

capped in assessing probable cause, yea or nay, without being able to look at the warrant application. Because the warrant application will probably be indispensable to proving the existence or non-existence of probable cause, the dispositive question becomes, therefore, that of who in that regard has the case to prove.

This Court applied the presumption of validity in favor of the State in the case of *In re Special Investigation No. 228*, 54 Md.App. 149, 195–96, 458 A.2d 820 (1983):

> *We begin with the undisputed proposition that a warrant is presumptively valid. Franks v. Delaware*, 438 U.S. 154, 171, 98 S.Ct. 2674, 57 L.Ed.2d 667[.] ... *The burdens of proof* (both of producing evidence and of persuasion), therefore, *are upon the party who would rebut that presumptive validity. Rawlings v. Kentucky*, 448 U.S. 98, 104, 100 S.Ct. 2556, 65 L.Ed.2d 633[.] "Petitioner ... bears the burden of proving ... that the search ... was illegal[.]" ...
>
> *It was*, of course, *the petitioners who sought to persuade the court that there was, inter alia, a lack of probable cause* under § 551(a) so as to compel the restoration of the seized property "to the person from whom it was taken." *The burden was not upon the State to prove that there was probable cause; it was upon the petitioners to prove that there was not.* In this regard, they proved absolutely nothing.

(Emphasis supplied). The defendant, bearing the burden of rebutting that presumption, lost the nothing-to-nothing tie.

## The Allocation of the Burdens
## Will Sometimes, But Not in This Case, Shift

Let one critically different fact be established, however, and the burdens shift dramatically. This is what happens when the reverse side, to wit, "tails," of the incentive/disincentive coin lands in the "up" position. When the State has procured evidence of guilt via the disfavored or non-preferred modality of a warrantless search, it is the State that suffers the

disincentive of a **presumption of invalidity.** It is the State that then must assume the burden of rebutting that presumption of invalidity and of proving that the warrantless search was somehow justified under one of the "jealously guarded" exceptions to the warrant requirement.

██ The reversible tilt of the playing field is clear. If it is established that a search was pursuant to a judicially issued warrant but the record is utterly silent as to the justification for the warrant, the State enjoys a presumption as to its validity and the defendant, having failed to carry the burden of rebuttal, loses the nothing-to-nothing tie. If, on the other hand, it is established that the search was warrantless and the record is utterly silent as to the justification for the warrantless search, the defendant enjoys a presumption as to its invalidity and the State, having failed to carry its burden of rebuttal, loses that nothing-to-nothing tie.

In the case now before us, it was accepted by all parties that the search of 219 Willis Street was pursuant to a judicially issued warrant. There was no challenge to the facial validity of the warrant. Because there was no warrantless search, the burdens in this case never shifted to the State.

██ If to prove his case, the appellant needed Judge Johnson, for some unstated reason, to examine the search-authorizing documents in this case, the appellant was free to offer him copies of the pertinent documents. He did not do so. It was the appellant who bore the risk of non-production. The State was under no obligation to offer anything.

### Persuasive Authority
### From Sister Jurisdictions

Although the law on this procedural nuance is not extensive, what there is fully supports our holding in this case. The issue in *United States v. Thompson*, 421 F.2d 373 (5th Cir. 1970), was very similar to that now before us. The defendant there objected to the fact that "the warrant was never placed

into evidence." In affirming the conviction, the Fifth Circuit held, 421 F.2d at 377:

> There was uncontradicted testimony at the hearing that a Louisiana criminal district judge issued a warrant for the search, and this testimony was sufficient to establish the issuance of the warrant. *Since the issuance of a warrant was effectively established, the burden of establishing that the search was illegal was on movant-defendant.* Defendant, however, completely failed to sustain his burden of proving that the warrant was illegally issued or executed. *Defendant had access to the public records where the warrant was filed; he could have introduced the document into evidence in order to prove that it was illegally issued or executed. He did not do so.* In truth, defendant's only complaint is that the prosecution did not introduce the warrant into evidence. *We are aware of no rule of procedure, evidence or law that requires the prosecution to introduce a search warrant into evidence under such circumstances as are presented here.*

(Emphasis supplied). See also *United States v. Burkhart*, 347 F.2d 772, 774 (6th Cir.1965); *Chin Kay v. United States*, 311 F.2d 317, 321 (9th Cir.1962) ("The burden is on a defendant who seeks to suppress evidence obtained under a regularly issued warrant to show the want of probable cause.").

The same issue was before the Court of Criminal Appeals of Texas in *Ortega v. State*, 464 S.W.2d 876 (Tex.Cr.App.1971). That court held that once it is shown that a search warrant has been issued, the burden of production is clearly on the defendant.

> *Once the State shows that a valid search warrant is in existence* at the time of the search, *the burden of going forward is then on a defendant* to prove that the affidavit is insufficient as a matter of law and *to see that the search warrant and the affidavit are included in the record on appeal.*

464 S.W.2d at 877 (emphasis supplied). That court went on, 464 S.W.2d at 878:

[W]hen the existence of the warrant is recognized in a motion to suppress and there is uncontradicted testimony that a warrant existed, as in the present case, and there is no objection to its validity on its face, we hold that *it is not necessary for the record to show that the warrant was exhibited to the court.*

(Emphasis supplied).

In *State v. Hall,* 166 Or.App. 348, 999 P.2d 509 (2000), the trial judge suppressed physical evidence because of the state's "failing to introduce either a search warrant or supporting affidavit into evidence." 999 P.2d at 514. The Court of Appeals of Oregon reversed the suppression ruling, holding that where, as in the case now before us, the very existence of the warrant is not in dispute, there is no obligation on the state to produce the warrant:

We begin with the trial court's ruling that the state failed to prove the existence of the search warrants. If defendants' motion had notified the state that they challenged the searches as warrantless because no warrants were issued, the state would have had the burden of establishing the existence of the warrants. . . . The state could have been required to produce the warrants themselves. However, *defendants here never challenged the existence of the search warrants.* . . . Accordingly, *where defendants' motion* to suppress and arguments at the hearing *never challenged the existence of the search warrants and where defendants conceded their existence, the state was not obligated to produce the warrants to prove their existence.*

999 P.2d at 515 (emphasis supplied).

\* \* \*

One final thought, by way of very *obiter dicta.* In light of the broad range of incentives offered to the police for searching with warrants, any officer who looks beyond the immediate arrest to the fate of his case at the trial table would be foolhardy not to seize the advantages offered by a valid warrant whenever possible. His decision in that regard need

only be grounded in the very practical reality that he is thereby far more likely to win his case.

Officer Satterfield in this case employed the preferred searching modality. At the trial table the State, therefore, enjoyed the dispositive benefit of the presumption of validity. When a warrantless search imposes on the State the burdens of proof at a suppression hearing, the State may readily lose for a number of reasons. When, on the other hand, a search warrant beneficently relieves the State of such burdens, it is virtually impossible for the State to lose. That obviously is a "consummation devoutly to be wished."

In denying the appellant's motion to suppress, Judge Johnson was not in error.

**JUDGMENTS AFFIRMED; COSTS TO BE PAID BY APPELLANT.**